Mark **BLEDSOE**, Plaintiff,

v.

**PALM BEACH SOIL AND WATER CONSERVATION DISTRICT,** et al., Defendants.

No. 94–8360–CIV.

United States District Court, S.D. Florida.

Oct. 17, 1996.

---

Isidro M. Garcia, Garcia Elkins & Carbonell, P.A., West Palm Beach, FL, for Plaintiff.

Richard H. McDuff, Johnson, Anselmo, Murdoch, Burke & George, P.A., Fort Lauderdale, FL, James G. Brown, Brown & Green, Orlando, FL, Glen J. Torcivia, West Palm Beach, FL, for Defendant.

### ORDER GRANTING DEFENDANT PALM BEACH SOIL AND WATER CONSERVATION DISTRICT'S MOTION FOR SUMMARY JUDGMENT

RYSKAMP, District Judge.

THIS CAUSE came before the Court upon defendant Palm Beach Soil and Water Conservation District's Motion for Summary Judgment (DE 215), filed August 1, 1996. Plaintiff has responded in opposition. On September 20, 1996, the Court heard oral argument on the motion for summary judgment, and indicated that the motion would be granted.

### BACKGROUND

This case arises from plaintiff Mark Bledsoe's four-year tenure as Resource Technician for defendant Palm Beach Soil and Water Conservation District ("the District"). The position required that Bledsoe spend a large portion of his time walking, surveying, and performing manual labor in the fields. On February 26, 1990, while performing field work at Boynton Farm, plaintiff sustained an injury to the left knee. Upon the advice of his doctors that he should refrain from excessive walking and walking on uneven terrain, plaintiff requested some form of accommodation from his supervisor. In response, the District offered plaintiff the position of Resource Conservationist, but he rejected it. In October of 1992, the District terminated him.

On July 27, 1994, plaintiff settled his workers' compensation case. The parties signed a joint settlement agreement, which contained the following provision:

As further consideration for the aforementioned payment, the Employee/Claimant agrees and does hereby release, discharge, and surrender any and all claims, whether

or not asserted against the Employer/Carrier or Servicing Agent, or any of its officers, agents, servants, employees, directors, successors, assigns, and any other person or entity so connected to the Employer/Carrier or Servicing Agent, of any nature whatsoever....

Despite signing the release, plaintiff brought this action under the Americans with Disabilities Act (Title II of the "ADA"), 42 U.S.C. § 12131, and the Rehabilitation Act of 1973, 29 U.S.C. § 794 et seq., as amended by the Civil Rights Act of 1991, alleging that he incurred a disability for which the District provided no reasonable accommodation, and, as a result of which, the District terminated him from its employment.[1] The District has now moved for summary judgment, arguing that the release bars plaintiff's action, and that his employment discrimination claim is not cognizable under Title II of the ADA.

### LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) sets forth the standard governing summary judgment. In its most basic form, summary judgment is appropriate where there is no genuine issue of material fact in dispute and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U:S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ("the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Once the moving party has met its burden, the party opposing summary judgment may not simply rely on the pleadings or mere denials of the allegations. Rather, the

opposing party must adduce some evidence showing that material facts are in issue. *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514. "Rule 56(c) therefore requires a non-moving party to go beyond the pleadings and by [its] own affidavits or by the depositions, answers to interrogatories, and admissions on file designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *See also Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The Eleventh Circuit has restated the method for allocating burdens in a summary judgment motion. Specifically, in accordance with U.S. Supreme Court precedent,

> The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment.

*Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991).

### DISCUSSION

Defendant sets forth two reasons for the granting of summary judgment in its favor. The District argues that the release signed by plaintiff should be construed as a matter of law to prevent plaintiff from bringing this action, and that Title II of the ADA does not create a cause of action for discrimination in employment.

### I. THE RELEASE

■ The release argument is no stranger to this Court. In its Omnibus Order of July 27, 1995, the Court considered the very same argument, but declined to hold, as a matter of law, that the release barred plaintiff's

---

1. The original complaint named both the District and Palm Beach County, and was brought under Title I of the ADA. The District is not covered by Title I, because it does not have 15 or more employees. *See* 42 U.S.C. § 12111(5)(A). The Court dismissed the County as a defendant by

order dated July 27, 1995. On January 4, 1996, plaintiff filed his First Amended Complaint, now bringing an action under Title II of the ADA and the Rehabilitation Act. It is this complaint, and only the District as defendant, that are before the Court on this motion.

ADA and Rehabilitation Act claims. On authority of *Barefoot v. Sears Roebuck & Co.*, 650 So.2d 1036 (Fla. 1st DCA1995), the Court found that the release was not so unambiguous under Florida law as to warrant dismissal of the action.

Developments since the issuance of the Court's Omnibus Order suggest that reconsideration of this issue would be appropriate. By Order dated February 18, 1995, Judge Hurley of this same district and division found that a virtually identical handicap discrimination claim was barred by the exact same release executed by Mr. Bledsoe. *F.M. v. Palm Beach County*, 912 F.Supp. 514 (S.D.Fla.1995). The Eleventh Circuit affirmed without opinion, simply citing Eleventh Circuit Rule 36–1. *F.M. v. County Commissioners*, 84 F.3d 438 (11th Cir.1996).

At oral argument, counsel for plaintiff suggested that the Eleventh Circuit's decision is not binding on this Court because the Court of Appeals failed to issue an opinion. This is not precisely what the rules say. Eleventh Circuit Rule 36–2 does say that unpublished *opinions* are not considered binding precedent, but merely persuasive authority. However, we are not dealing here with an opinion, but with what Rule 36 of the Federal Rules of Appellate Procedure denominates "an entry of judgment." Indeed, Eleventh Circuit Rule 36–1 is expressly about the entry of judgment *without opinion*. Therefore, Eleventh Circuit Rule 36–2, relating to unpublished opinions, has no effect on the question of whether entries of judgment have binding precedential value. Indeed, entries of judgment without opinion are binding. *United States v. Cagnina*, 697 F.2d 915, 923 (11th Cir.) ("Affirmance without a published opinion is binding precedent for panels of the court, subject only to en banc consideration."), *cert. denied*, 464 U.S. 856, 104 S.Ct. 175, 78 L.Ed.2d 157 (1983). Whether this

Court is "bound" by the judgment of the Eleventh Circuit or merely "persuaded," it will join Judge Hurley and the Eleventh Circuit in finding that the release terminated plaintiff's right to sue for discrimination on the basis of handicap.[2]

## II. SUITS FOR EMPLOYMENT DISCRIMINATION UNDER TITLE II OF THE ADA

■ Defendant also argues that a State employer does not violate Title II of the ADA by dismissing an employee on the basis of his handicap, because Title II does not relate to employment. Plaintiff responds that a majority of federal courts to consider the issue have held otherwise, and that the legislative history of Title II supports the employment discrimination cause of action. Although the Court recognizes that it may be swimming against the current, it concurs with defendant, and holds that no cause of action for employment discrimination lies under Title II of the ADA. The Court notes, in passing, that resolution of this issue is not dispositive of this case because the release, discussed above, eliminates Bledsoe's claim, whether or not it is cognizable under Title II. Nonetheless, the Court feels that it would be remiss to avoid the Title II issue, which stands in sore need of careful and deliberate treatment.

### 1. The Split of Authority

The Eleventh Circuit has yet to pass on the question of whether Title II creates a cause of action for employment discrimination. The federal district courts, however, have split on the issue. At least one court has squarely held that Title II applies only to public services and programs, and that it does not cover employment.[3] *See Iskander*

---

2. Plaintiff also argues that even if the County has been released from his ADA claim, the District has not. However, this Court has already found that the District, and not the County, was Mr. Bledsoe's employer. The release language explicitly refers to the "Employer," and the Court finds, as it has already found, that this refers to the District.

3. Defendant cites a number of cases in which the court seems to assume that employment discrim-

ination actions are only cognizable under Title I. *See Hutchinson v. United Parcel Service, Inc.*, 883 F.Supp. 379, 396–97 (N.D.Iowa 1995); *Harrelson v. Elmore County*, 859 F.Supp. 1465, 1468 (M.D.Ala.1994); *Pinnock v. International House of Pancakes*, 844 F.Supp. 574, 578 n. 3 (S.D.Cal. 1993); *Kinney v. Yerusalim*, 812 F.Supp. 547, 548 (E.D.Pa.), *aff'd*, 9 F.3d 1067 (3d Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1545, 128 L.Ed.2d 196 (1994). These cases are helpful

*v. Rodeo Sanitary Dist.*, 1995 WL 56578 *9 (N.D.Cal.1995) ("Title II is inapplicable to the District's composition of employees."); *see also Dertz v. City of Chicago*, 912 F.Supp. 319, 325 (N.D.Ill.1995) (distinguishing between suits for "employment discrimination" under Title I and for "discrimination in the administration of a public program" under Title II). The majority of the federal district courts to rule on the issue, however, have taken the view that Title II does comprehend a public entity's employment practices. *See Wagner v. Texas A & M Univ.*, 939 F.Supp. 1297, 1309–10 (S.D.Tex.1996); *Graboski v. Guiliani*, 937 F.Supp. 258, 268–69 (S.D.N.Y. 1996); *Silk v. City of Chicago*, 1996 WL 312074 *10 (N.D.Ill.1996); *Bruton v. Southeastern Pennsylvania Transp. Authority*, 1994 WL 470277 *2 (E.D.Pa.1994); *Ethridge v. Alabama*, 847 F.Supp. 903, 906 (M.D.Ala. 1993); *Eisfelder v. Michigan Dept. of Natural Resources*, 847 F.Supp. 78, 83 (W.D.Mich. 1993); *Finley v. Giacobbe*, 827 F.Supp. 215, 219–20 (S.D.N.Y.1993); *Petersen v. University of Wisconsin Bd. of Regents*, 818 F.Supp. 1276, 1278 (W.D.Wis.1993); *Bell v. Retirement Bd. of the Firemen's Annuity and Benefit Fund of Chicago*, 1993 WL 398612 *4 (N.D.Ill.1993). At least one federal Court of Appeals has agreed. *See Doe v. University of Maryland Medical Sys. Corp*, 50 F.3d 1261, 1264–65 (4th Cir.1995).

Although it respects the weight of the contrary authority, the Court finds itself unable to join the courts that have held (or assumed) that a cause of action for employment discrimination lies under Title II. Many of these courts have permitted an employment discrimination suit under Title II without discussing the issue at any length (or at all). The Court suspects that the presence of the Justice Department regulation discussed below, 28 C.F.R. § 35.140, has deterred defense attorneys from raising the employment issue, so that many of the courts have permitted the employment cause of action without full attention to the problems it poses. On the other hand, the Court is unpersuaded by the few opinions squarely addressing the issue, for the reasons explained below.

## 2. The Text of the ADA

In analyzing the meaning of Title II, the Court begins at the logical starting point, the language of the statute itself. *See Bread Pol. Action. Comm. v. FEC*, 455 U.S. 577, 580, 102 S.Ct. 1235, 1237, 71 L.Ed.2d 432 (1982) ("statutory construction 'must begin with the language of the statute itself'...."), *citing Dawson Chemical Co. v. Rohm & Haas Co.*, 448 U.S. 176, 187, 100 S.Ct. 2601, 2609, 65 L.Ed.2d 696 (1980). "Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980).

Title II provides that "[s]ubject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (hereinafter "Title II"). Public entities include "(A) any State or local government; [and] (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government" 42 U.S.C. § 12131. Neither the definition section of Title II, 42 U.S.C. § 12131, nor the definition section for the entire ADA, 42 U.S.C. § 12102, defines the words that are crucial to this discussion: "services, programs, or activities."

The question, then, is whether the terms "services, programs, or activities" bear a plain meaning inclusive of the term "employment." As a matter of first impression, they do not. In a literalistic sense, a public entity's hiring decisions might be called "activities" of that entity (or one might say that the entity has a hiring "program"). However, the phrase "services, programs, or activities," understood as a whole, focuses on a public's entity's outputs rather than on its imputs.

insofar as they reiterate what appears to be obvious from the statute—that Title I deals with employment and Title II deals with public services. However, these courts did not specifically address the issue of whether a cause of action for employment discrimination is cognizable under Title II, and their precedential force is therefore somewhat weak.

Other district courts have quite sensibly held that community services such as foster care programs, *Eric L. By and Through Schierberl v. Bird*, 848 F.Supp. 303, 314 (D.N.H. 1994), and bond financing for housing projects, *Independent Housing Servs. of San Francisco v. Fillmore Center Assoc., DMJM*, 840 F.Supp. 1328, 1344 (N.D.Cal.1993), are the sort of programs covered by Title II. These agency outputs, along with parks, recreational facilities, and similar government services, lie at the center of Title II's protection. *See Concerned Parents to Save Dreher Park Center v. City of West Palm Beach*, 846 F.Supp. 986 (S.D.Fla.1994) (park center is a service covered under Title II).

Public employment, on the other hand, is not offered as a community service. Rather, it is an imput into the public entity that permits that entity to produce desired outputs, such as parks and schools.[4] Indeed, several of the district courts to consider the Title II employment issue have recognized that the plain language of Title II does not appear to comprehend employment, or that it is at best silent on the issue. *See Wagner*, 939 F.Supp. at 1309 ("[I]t is not apparent from the plain language of § 12132 ... that the prohibition against discrimination by public entities includes employment discrimination."); *Ethridge*, 847 F.Supp. at 905 ("A plain reading of this section does not reveal ... whether Title II covers 'employment' discrimination....."); *Silk*, 1996 WL 312074 *10 (An employment cause of action is not expressly stated in Title II); *Petersen*, 818 F.Supp. at 1278 ("[I]t is not obvious from the plain language of § 12132 ... that the prohibition against discrimination by public entities includes employment discrimination."). Although these courts proceed to find other reasons to extend Title II to employment, their initial comments provide compelling evidence that this Court is not alone in finding

no textual basis for the employment discrimination cause of action in Title II.

■ Although the Court finds that the text of Title II, standing alone, does not support an employment discrimination cause of action, the textual inquiry should not end there. In ascertaining the plain meaning of a statute, a court should look not only to the discrete portion of the statute at issue, "but to the design of the statute as a whole and to its object and policy." *McCarthy v. Bronson*, 500 U.S. 136, 139, 111 S.Ct. 1737, 1740, 114 L.Ed.2d 194 (1991), *citing Crandon v. United States*, 494 U.S. 152, 158, 110 S.Ct. 997, 1001–02, 108 L.Ed.2d 132 (1990); *see also K Mart Corp. v. Cartier*, 486 U.S. 281, 291, 108 S.Ct. 1811, 1818, 100 L.Ed.2d 313 (1988) ("In ascertaining the meaning of a statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole."). In this case, the wholistic statutory inquiry lends further strength to the position that Title II does not cover employment.

The fundamental problem with including employment under Title II is that such a move renders Title I redundant, insofar as Title I applies to public entities. Title I applies explicitly, and exclusively, to employment: "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 28 U.S.C. § 12112(a). The term "covered entity" in Title I includes those who are "public entities" under Title II. *See* 28 U.S.C. § 12111(2), (5) (covered entities are employers engaged in industry affecting commerce who have 15 or more employees, excluding the United States and a few others).[5] Thus, under the majority view in the

---

**4.** The Court recognizes that the Supreme Court has construed similar language in the Rehabilitation Act to include employment. *See Consolidated Rail Corp. v. Darrone*, 465 U.S. 624, 104 S.Ct. 1248, 79 L.Ed.2d 568 (1984). However, the Rehabilitation Act only applied to any "program or activity," and added that these were to be construed to include "all operations" of the covered entities. 29 U.S.C. § 794(b). The Court believes that by adding the word "service," and creating

an entire new section devoted to employment, Congress meant to bifurcate the ADA into one section dealing with public and private employment relationships, and one section dealing with government services.

**5.** In fact, the term "employer" in Title I is defined as "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar

district courts, public entities with 15 or more employees may be sued for employment discrimination under either Title I or Title II. As one court put it, this position requires that "that Title I and Title II analysis coalesce in employment discrimination matters." *Graboski*, 937 F.Supp. at 269.

■ This result is unacceptable as a matter of statutory construction. It is a "cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant." *Kungys v. United States*, 485 U.S. 759, 778, 108 S.Ct. 1537, 1550, 99 L.Ed.2d 839 (1988). Although Title I is not rendered *entirely* redundant by allowing an employment cause of action under Title II, it is rendered redundant insofar as it applies to public entities with 15 or more employees. Additionally, in order to accept the majority position, one must believe that Congress intended that the 15 employee threshold for employment suits should not apply to public employers. But if this was Congress's intent, it could easily have spelled this out in the definition of "covered entity" in Title I. Indeed, when Congress wanted to make exceptions to the general definition of a "covered entity" it did so. *See* 42 U.S.C. § 12111(5)(B) ("Exceptions"). If what Congress really meant to say is that all public entities are subject to the ADA in their employment decisions, it chose an exceptionally awkward means of expressing its intention. Given the choice between accepting the awkward and redundant formulation of the entire statute, and accepting what the Court finds to be the plain meaning of Title II, it readily chooses the latter.

A further textual incongruity arises from the majority position. Title I very clearly incorporates the procedures of Title VII of the Civil Rights Act of 1964, which require a plaintiff to file a charge with the Equal Opportunity Employment Commission before filing a claim in federal court. *See* 42 U.S.C. § 2000e–5(e) and (f)(1) (exhaustion requirement); 42 U.S.C. § 12117(a) (Title I incorporation by reference). On the other hand, Title II adopts the remedies, procedures, and rights of the Rehabilitation Act of 1973, 29 U.S.C. 794(a), which do not require exhaustion of administrative remedies. If plaintiffs may sue public entities for employment discrimination under either Title I or Title II, then they may simply sue under Title II and disregard the exhaustion requirement, even if the employer has more than 15 employees. And so the district courts in the majority have held. *See Petersen*, 818 F.Supp. at 1278–79; *Silk*, 1996 WL 312074 *10; *Wagner*, 939 F.Supp. at 1309–10; *Finley*, 827 F.Supp. at 219 n. 3; *Ethridge*, 847 F.Supp. at 906–07.

Acceptance of the "no exhaustion rule," when coupled with the slighting of Title II's plain meaning and the redundancy of Titles I and II, renders the entire statutory framework a monstrous distortion. The statute Congress gave us was relatively straightforward: Title I would apply to employment; it would only bind entities employing 15 people or more; it would require exhaustion of administrative remedies. Title II would apply to government services; it would not depend on the size of the government entity; it would not require administrative remedies. The statute the majority of the district courts (and the Justice Department) give us is completely bewildering: Both Title I and Titles II apply to employment, although Title II says nothing at all on the subject and Title I lays out a comprehensive scheme to deal with employment issues; Title I says an employer

weeks in the current or preceding calendar year." 42 U.S.C. § 12111(5). Logically, for a person to sue a "public entity" for employment discrimination under Title II, he would have to sue his public employer. If, however, an "employer" within the meaning of the ADA is one who employs fifteen or more employees, then a suit for employment discrimination would not lie against an employer of less than fifteen employees, even under Title II. The answer to this dilemma is that the definition of "employer" in section 12111(5) only applies to Title I, and that

Title II does not even contain the word "employer." But this answer only further compounds the problem by making one who is not an employer for purposes of Title I an employer for purposes of Title II. The net effect of accepting plaintiff's position in this case is that the concept of who is an employer has a different meaning under Titles I and II. Although words may mean different things in different contexts, it is strange to think that they would mean different things in two titles of the same statute, especially when the word is clearly defined in one title, and only implicit (if anything) in the other title.

must hire 15 employees to be sued for employment discrimination, but you can get around this under Title II if your employer is an arm of the State; Title I says you must exhaust administrative remedies, but you can ignore this requirement too if you are employed by the State. If this is really what Congress meant, then the ADA surely must rank as one of the great drafting debacles of recent times. Unwilling to impute such sheer ineptitude to Congress, the Court must part company with the current consensus.

### 3. The Legislative History of Title II

In perhaps the most thorough opinion accepting a cause of action for employment discrimination under Title II, the *Ethridge* court relied heavily upon the ADA's legislative history. *See* 847 F.Supp. at 905–06. Although this Court has reservations about placing heavy reliance on legislative history, particularly in the face of a relatively unambiguous statute, it nonetheless considers it wise to address the arguments raised in *Ethridge*.

First, the *Ethridge* court found it relevant that a primary purpose of Title II was to extend the reach of the Rehabilitation Act "to all programs, activities, and services provided or made available by state and local governments or instrumentalities or agencies thereto, regardless of whether or not such entities receive Federal financial assistance." 847 F.Supp. at 906, *citing* H.Rep. No. 485(II), 101st Cong., 2d Sess. 84 (1990), *reprinted in* 1990 U.S.C.C.A.N. 267, 366. The court further noted that the Supreme Court has construed the Rehabilitation Act to cover employment discrimination. 847 F.Supp. at 906, *citing Consolidated Rail Corp. v. Darrone*, 465 U.S. 624, 626, 104 S.Ct. 1248, 1250, 79 L.Ed.2d 568 (1984). However, what is most notable about Congress's cross-reference to the Rehabilitation Act is that, in conjunction with the passage of the ADA, Congress explicitly cross-referenced the Rehabilitation Act back to *Title I* of the ADA, insofar as the Rehabilitation Act relates to employment. "The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabili-

ties Act of 1990...." 29 U.S.C. § 794(d). In other words, although the legislative history indicates that Congress wanted Title II to be coextensive with the Rehabilitation Act, Congress tied employment discrimination under the Rehabilitation Act to employment discrimination under *Title I* of the ADA. It would seem rather bizarre to find an employment cause of action in Title II of the ADA on the grounds that Title II is tied to the Rehabilitation Act, when the Rehabilitation Act itself ties its employment cause of action to Title I. When Congress said it wanted Title II to be coextensive with the Rehabilitation Act, it apparently did not mean to displace Title I as the ADA's vehicle for employment discrimination suits.

Second, the *Ethridge* court claims that "[t]he House Report's discussion of § 12132 further clarifies that Title II incorporates employment discrimination as proscribed in Title I and the Rehabilitation Act." 847 F.Supp. at 906. The court cites the following language from the House Committee Report:

The Committee has chosen not to list all the types of actions that are included within the term "discrimination", as was done in titles I and II, because this title essentially simply extends the anti-discrimination prohibition embodied in [the Rehabilitation Act] to all actions of state and local governments. The Committee intends, however, that the forms of discrimination prohibited by [§ 12132] be identical to those set out in the applicable provisions of titles I and III of this legislation.

*Id.* at 906, *citing* H.Rep. No. 101–485(II), 101st Cong., 2d Sess. 84 (1990), *reprinted in* 1990 U.S.C.C.A.N. 367. The continuation of the above-quoted passage offers further support for the *Ethridge* court's position: "Thus, for example, the construction of "discrimination" set forth in section 102(b) and (c) and section 302(b) should be incorporated in the regulations implementing this title." H.Rep. No. 101–485(II), 101st Cong., 2d Sess. 84 (1990), *reprinted in* 1990 U.S.C.C.A.N. 367.

■ From this language the Court concludes that the framers of the House Report intended to cover employment decisions under Title II. The opinion of select members of one house of Congress, however, cannot

take precedence over the plain meaning of the statute. The Supreme Court has warned against giving "authoritative weight to a single passage of legislative history that is in no way anchored in the text of the statute." *Shannon v. United States,* 512 U.S. 573, ——, 114 S.Ct. 2419, 2426, 129 L.Ed.2d 459 (1994). A court may not "give effect to [a] snippet of legislative history" when so doing would require abandoning "altogether the text of the statute as a guide in the interpretative process." *Id.* "[C]ourts have no authority to enforce [a] principl[e] gleaned solely from legislative history that has no statutory point of reference." *Id., citing International Brotherhood of Elec. Workers, Local Union No. 474, AFL–CIO v. NLRB,* 814 F.2d 697, 712 (C.A.D.C.1987) (brackets in cited source).

The Supreme Court's admonition against using isolated snippets of legislative history as controlling guides to statutory construction proves itself wise in this case. Although the House report embraces the Title II employment discrimination cause of action, a different understanding appears from some of the debate in the Senate. Consider the following colloquy between Senators Harkin and Boschwitz:

Mr. Boschwitz.

I very frankly think that most Senators do not understand the implications of some of the provisions. Let me first, ask when you talk about employment, does the 15 or less employees mean full time or part time employees?

Mr. Harkin.

The term employer means a person engaged in industry effecting [sic] commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person except that for 2 years following the effective date of this title and [sic] employer means a person engaged in industry affecting commerce who has 25 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding year and any agent of such person. It is the same definition as in title 7.

Mr. Boschwitz.

But it includes part-time employees. I gather from that definition, they do not all have to be there at once is that right? Fifteen or more employees for each working day. So they may have four or five in the morning and five in the evening and six or eight in the middle of the day.

Mr. Harkin.

It says 15 or more employees for each working day.

Mr. Boschwitz.

But do they have to all be there at one time, I say to the Senator. Your staff is nodding their heads yes. Does that mean they will have to all be there at one time?

Mr. Harkin.

Well, if the Senator would just withhold for just a moment I will find out the exact answer. This is the same language that has been used in Title 7 for 25 years. So there must not be too much of a problem with it. If the Senator would just hold for a second we will find out if there has been any problem with it for 25 years.

Mr. Boschwitz.

I will ask another question.

Mr. Harkin.

Do you have another question?

Mr. Boschwitz.

I do. I ask whether or not it would apply to townships, municipal governments, and counties and so forth?

Mr. Harkin.

Yes, it does affect local governments.

Mr. Boschwitz.

It does effect all local governments?

Mr. Harkin.

Yes.

Mr. Boschwitz.

So even some people who are paid just a few dollars by a local government are included? This may well include even some very small localities? . . . .

135 Cong.Rec. S10734–02, *S10750 (Sept. 7, 1989) (emphasis supplied).

Additional evidence of the conflicting "intent of Congress" appears in the statements

of Representative Miller, speaking in support of the ADA *as a whole.*

This legislation will prohibit discrimination against individuals with disabilities in employment, programs or activities of a State or local government, in public accommodations, transportation, and telecommunications. It does so by providing protections that are consistent with other Federal civil rights laws long on the books. Its protections are far-reaching, yet the demands in [sic] places on compliance are modest. It initially exempts employers with fewer than 25 employees for the first 2 years, and therefore, employers with fewer than 15 employees....

136 Cong.Rec. H2421–02, *H2448 (May 17, 1990) (statement of Rep. Miller).

From these admittedly ambiguous snippets of legislative history, it seems that at least some members of Congress understood the fifteen employee threshold of Title I to apply to state and local government, as well as to private employers. Certainly, these passages do not permit the Court to impute to Congress an intention to make Title I (including its fifteen employee threshold and exhaustion of administrative remedies requirement) the exclusive vehicle for employment discrimination actions under the ADA. However, they sap the strength of the House Report's observation that employment actions are cognizable under Title II. At the very least, it must be said that while some members of Congress understood Title II to comprehend employment, not all members of Congress shared this understanding. Even assuming that the members of Congress not affirmatively espousing the position of the House Report did not have a sufficiently clear understanding of the issue to express a negative opinion on that position, their assumption that the fifteen employee threshold applies to state and local government prevents the House Report from counting as the definitive "intent of Congress," if any such creature exists.

If this were a civil trial, in which the intent of Congress as manifested in the legislative history had to be proven by a preponderance of the evidence, the Court might find in favor of the Title II employment cause of action

position. This is not such a case. The text of the statute is clear, and the legislative history conflicting. Having "no authority to enforce [a] principl[e] gleaned solely from legislative history that has no statutory reference point," *Shannon,* 512 U.S. at ——, 114 S.Ct. at 2426 (citation omitted), the Court will not accord controlling weight to the House Report.

### 4. Deference to the Justice Department's Regulation

The difficulty with this Court's rejection of the Title II employment cause of action does not end with the legislative history. Acting pursuant to 42 U.S.C. section 12134, the Attorney General has promulgated regulations to effectuate subtitle A of Title II. These regulations include a prohibition against employment discrimination.

§ 35.140 **Employment discrimination prohibited**

(a) No qualified individual with a disability shall, on the basis of disability, be subjected to discrimination in employment under any service, program, or activity conducted by a public entity.

(b)(1) For purposes of this part, the requirements of title I of the Act, as established by the regulations of the Equal Employment Opportunity Commission in 29 CFR part 1630, apply to employment in any service, program, or activity conducted by a public entity if that public entity is also subject to the jurisdiction of title I.

28 C.F.R. § 35.140.

The Court is, of course, familiar with the principle that "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). It is also true, however, that "[i]f a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Id.* at 843 n. 9, 104 S.Ct. at 2782 n. 9. The Supreme Court has not hesitated to override regulations promulgated by administrative agencies

when traditional tools of statutory construction render a result contrary to the agency's position. *See I.N.S. v. Cardoza–Fonseca,* 480 U.S. 421, 446, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987); *Dole v. United Steelworkers of America,* 494 U.S. 26, 42, 110 S.Ct. 929, 938, 108 L.Ed.2d 23 (1990); *see also Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 475, 112 S.Ct. 2589, 2594, 120 L.Ed.2d 379 (1992) ("In a statutory construction case, the beginning point must be the language of the statute, and when the statute speaks with clarity to an issue judicial inquiry into the statute's meaning, in all but the most extraordinary circumstances, is finished."); *MCI Telecommunications Corp. v. American Telephone and Telegraph Co.,* 518 U.S. 218, ——, 114 S.Ct. 2223, 2231, 129 L.Ed.2d 182 (1994) ("[A]n agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning the statute can bear....").

■ The Court has previously remarked that the plain language of the ADA, when read as a whole, does not support a cause of action for employment discrimination under Title II. *Chevron* deference notwithstanding, the Court does not believe that the conflicting legislative history sufficiently obfuscates the statute to create a vacuum of meaning for the Justice Department to fill. When the language of a statute is plain, administrative interpretation of the statute is not entitled to deference. *Demarest v. Manspeaker,* 498 U.S. 184, 190, 111 S.Ct. 599, 603–04, 112 L.Ed.2d 608 (1991). The meaning of Titles I and II of the ADA is plain enough as to the employment issue, and the Justice Department's regulation, therefore, is overruled.

### 5. Final Comments on the ADA Issues

The Court recognizes that it is taking an unusual step in parting with the overwhelming majority of the district courts (and at least one circuit court), in declining to follow the clear statement in the House Report, and in overruling a Justice Department regulation. This is, however, a case in which the plain meaning of the statute enacted by Congress, and not the intentions of individual members of that body or the judgment of

lawyers at the Justice Department, must control. It seems to the Court that the process of statutory construction increasingly is moving in a direction in which secondary or tertiary means of ascertaining the meaning of a statute are replacing the traditional judicial enterprise of reading the plain language of the statute as a whole. This has the effect of delegating ultimate lawmaking power to congressional committees (or subcommittees) and unelected bureaucrats. With all due respect to the members of congressional committees and the employees of administrative agencies, the Court believes that our republican form of government is best served when the courts apply the law as written, not as intended by some, or delegated to others.

### *CONCLUSION*

The Court finds that plaintiff has contractually released defendant Palm Beach Soil and Water Preservation District from the claims at issue in this case. Additionally, the Court finds that plaintiff has not stated a claim under Title II of the ADA. Wherefore, it is

ORDERED AND ADJUDGED that defendant Palm Beach Soil and Water Conservation District's Motion for Summary Judgment **(DE 215)** be, and the same is hereby **GRANTED.** An order granting final summary judgment in favor of defendant shall be separately entered.

DONE AND ORDERED.